# EXHIBIT A

Filing # 255815859 E-Filed 08/27/2026 09:13:46 AM

**IN THE CIRCUIT COURT OF THE TENTH JUDICIAL CIRCUIT IN AND FOR POLK COUNTY, FLORIDA**

| | |
|---|---|
| OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA, DEPARTMENT OF LEGAL AFFAIRS,<br><br>*Plaintiff*,<br><br>v.<br><br>PRIME THERAPEUTICS LLC; EXPRESS SCRIPTS, INC.,<br><br>*Defendants.* | CIVIL DIVISION<br><br>Case No. __________ |

**COMPLAINT**

1. Floridians depend on their local pharmacies for medications essential to their health and that of their loved ones. Prime Therapeutics and Express Scripts couldn't care less. They callously fixed the prices at which Florida's pharmacies are paid for providing these critical medications. Doing so made them billions—but at a cost.

2. Pharmacies across Florida suddenly found themselves filling prescriptions at much lower reimbursement rates—meaning they made less money for each prescription they filled. Reimbursement rates declined for almost eighty percent of prescriptions. Some rates went down so much, they fell below the cost to pharmacies to fill them. Enough.

3. The Attorney General brings this action to restore competition, hold Defendants accountable, and stop the harm to Florida pharmacies and the Floridians that rely on them.



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

## JURISDICTION AND VENUE

4. This is an enforcement action under the Attorney General's power and duty to enforce the Florida Antitrust Act, Chapter 542, Florida Statutes ("Antitrust Act"), the Florida Deceptive and Unfair Trade Practices Act, Chapter 501 Part II, Florida Statutes ("FDUTPA"), and common law.

5. The Attorney General seeks relief under these statutes in an amount greater than Fifty Thousand Dollars ($50,000), exclusive of fees and costs.

6. The Attorney General seeks equitable relief, declaratory relief, civil penalties, disgorgement, injunctive relief, attorneys' fees and costs, damages, and any other relief, general or specific, against the Defendants under Florida law both on behalf of the Attorney General and the Florida businesses the Attorney General is charged to protect.

7. This court has subject matter jurisdiction pursuant to the provisions of Chapter 542, Chapter 501, Part II, and Chapter 26.012 Florida Statutes.

8. Venue is proper in the Tenth Judicial Circuit because Defendants operate in more than one judicial circuit in the State of Florida, including Polk County and the Tenth Judicial Circuit.

9. This Court has personal jurisdiction over all Defendants here. This Court has personal jurisdiction over Defendants under Florida's long-arm statute, section 48.193(1)(a), Florida Statutes, because Defendants maintain substantial contacts in Florida.

10. Defendants have availed themselves of the benefits of transacting business in Florida.

11. ESI is registered with the State of Florida to provide pharmacy benefit services in Florida. ESI has entered into multiple pharmacy benefit management agreements with plan sponsors in Florida to provide PBM services. These agreements are governed by Florida law. ESI has also entered into hundreds of pharmacy provider agreements with Florida pharmacies in which these pharmacies are added to the network for dispensing pharmaceuticals. ESI has employees located in Florida.

12. Prime is registered with the State of Florida to provide PBM services in Florida. Prime has entered into multiple service agreements with plan sponsors in Florida. These contracts require the application of Florida law and require Prime to provide PBM services for the plan sponsors' members. Prime also enters into hundreds of pharmacy participation agreements with Florida pharmacies. These agreements allow participating pharmacies to dispense drugs to the members of Prime's clients, the plan sponsors. Prime has hundreds of employees located in Florida. Prime is also owned by 19 Blue Cross Blue Shield ("BCBS") health plans and affiliates, including Florida Blue. Prime provides PBM services to these BCBS plans, including for the University of Florida's health plan: GatorCare.

13. The conduct described in this Complaint and the harm caused by Defendants arise from Defendants' activities directed to Florida and its businesses.

14. The Attorney General brings this action exclusively under the laws of the State of Florida. No federal claims are being asserted.

## PARTIES

15. Plaintiff, Office of the Attorney General, State of Florida, Department of Legal Affairs ("Attorney General"), is an enforcing authority of Chapter 542 and Chapter 501, Part II, Florida Statutes, and as the head of the Department of Legal Affairs, he may bring common-law claims. He may bring this action for equitable relief, declaratory relief, civil penalties, injunctive relief, attorney's fees and costs, damages, and other relief under these chapters of State law and common law.

16. The Attorney General is an enforcing authority of the Florida Deceptive and Unfair Trade Practices Act, which prohibits unfair or deceptive acts or practices or unfair methods of competition in the conduct of any trade or commerce. He has determined that this enforcement action serves the public interest.

17. Defendant Prime Therapeutics LLC ("Prime") is the sixth-largest pharmacy benefit manager in the United States. It is a limited liability company organized under the laws of Delaware and with its principal place of business in Minnesota.

18. Defendant Express Scripts, Inc. ("ESI") is the second-largest pharmacy benefit managers in the United States. It is a Delaware corporation with its principal place of business in Missouri.

19. Prime and ESI are competitors.

## TRADE AND COMMERCE

20. Defendants Prime and ESI have engaged in trade or commerce in Florida as defined in sections 542.17(4) and 501.203(8), Florida Statutes.

21. Under FDUTPA, "[t]rade or commerce" means the "advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, wherever situated," and "shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity." § 501.203(8), Fla. Stat.

22. Under the Florida Antitrust Act, "[t]rade or commerce" means "any economic activity of any type whatsoever involving any commodity or service whatsoever." § 542.17(4), Fla. Stat.

23. Both Prime and ESI sell a service by offering and providing—via sale and for profit—management and administration of health plans, including, but not limited to, administration of pharmacy benefits, claims processing, pharmacy network contracting, formulary management, and clinical services.

24. Defendants' paid services to clients qualify as economic activity involving a service under the Florida Antitrust Act and the offering or sale of a service under FDUTPA.

## FACTUAL ALLEGATIONS

25. Defendants are competitors who entered into a horizontal agreement to fix the price of reimbursement rates paid to retail pharmacies across Florida, which

is a *per se* violation of Florida antitrust law. In doing so, they executed a plainly anticompetitive agreement. No elaborate study of the industry is needed to establish its illegality. The Agreement is a naked restraint of trade with no purpose except the stifling of competition.

## I. Industry Background

### A. Pharmacy Benefit Managers

26. Healthcare patients must navigate layers of organizations to obtain the full, comprehensive care they need. One level of that structure is particularly opaque. That level is where PBMs like Prime and ESI operate. Usually, a patient has no contact with his or her PBM. But these shadowy PBMs control not only the price of prescription drugs, but also which specific drugs from specific manufacturers a patient may receive. They also design formularies, which are a list of drugs that are covered by a health insurance plan, including what co-pay a patient might need to pay to get a prescription filled.

27. Unlike patients, pharmacies large and small interact with PBMs daily. PBMs act as a middleman on behalf of healthcare plan sponsors—typically employers—to facilitate the dispensation of prescription drugs by retail pharmacies to patients or members of the healthcare plan sponsor. Healthcare plan sponsors compensate PBMs for facilitating the dispensation of drugs and processing claims on behalf of the plan sponsors for their plan members.

28. PBMs compete with each other for business from healthcare plan sponsors by offering preferential terms that plan sponsors believe will best serve their



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

members. PBMs also compete with each other to scale their pharmacy networks, as measured by the number of pharmacies a PBM has contracted with to dispense drugs. The larger the pharmacy network, the more options a patient or a plan member has to fill a prescription. Thus, to compete for plan sponsor business, PBMs also must compete to sign up retail pharmacies to the PBM's pharmacy network.

29. One way that PBMs compete for pharmacies is with the number of covered lives PBMs serve. Covered lives represent a PBM's number of patients that could seek to fill a prescription at a pharmacy. The more covered lives a PBM serves, the more enticing—even necessary—it is for a pharmacy to join that PBM's pharmacy network. Additionally, PBMs compete on the reimbursement rates offered to pharmacies that are part of a PBM's pharmacy network. The higher the pharmacy reimbursement rate for a particular prescription drug, the more likely a pharmacy will be to agree to join that pharmacy network.

30. A pharmacy's entire livelihood depends on being reimbursed by a PBM for the cost of the prescription drugs that a pharmacy dispenses—known as the reimbursement rate. These rates are established by contract between the PBM and the pharmacy. The reimbursements can include, but are not limited to, reimbursement for the cost of the drug, dispensing fees to compensate the pharmacy for providing the service of filling the prescription, ingredient costs (pill bottles, labels, etc.), and all other costs, fees, and expenses incurred by a pharmacy in the course of filling a prescription.

31. The pharmacy's reimbursement rate directly impacts whether a pharmacy makes a profit for dispensing any given prescription or if a pharmacy dispenses that prescription at a loss. Dispensing at a loss puts downward pressure on the pharmacies' margins and may contribute to the ability of the pharmacy to continue to serve customers—or even continue to exist at all.

**B. The PBM Industry**

32. The PBM industry has become highly concentrated. The six largest PBMs—including Prime and ESI—collectively manage approximately 94 percent of prescription drug claims across the nation (the "Big 6").

33. ESI is one of the three largest, or one of the "Big 3" PBMs along with CVS Caremark and OptumRx. The "Big 3" collectively process about 80 percent of all prescription drug claims in the United States. ESI has a network of nearly 64,000 pharmacies, including more than 20,000 independent pharmacies across the country. ESI administers the pharmacy benefits of one in three Americans, equating to an excess of 100 million covered lives.

34. Prime falls outside the "Big 3" but is still within the "Big 6." It administers the pharmacy benefits for approximately 30-35 million covered lives. Of particular relevance here, Prime is the largest PBM in Florida with around 40% market share.

35. The complete "Big 6" includes (1) CVS-Caremark; (2) Defendant ESI; (3) OptumRx; (4) Humana; (5) MedImpact; and (6) Defendant Prime:



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

**Figure 1. PBMs: Ownership and Vertical Integration**[16]

| | | | | | | |
|---|---|---|---|---|---|---|
| Parent/Owner | CVS Health Corporation | The Cigna Group | UnitedHealth Group Inc. | Humana Inc. | MedImpact Holdings Inc. | 19 BlueCross BlueShield plans |
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals | NUVAILA | | | |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group | Optum Health | CenterWell | | |
| Pharmacy Benefit Manager | CVS caremark 34 | 23 | Optum Rx 22 | 7 | MedImpact 5 | PRIME 3 |
| "PBM GPO"/ Rebate Aggregator | Zinc Health Services | Ascent Health Services | Emisar Pharma Services | Ascent (via contract) | Prescient Holdings Group LLC | Ascent (minority owner) |
| Pharmacy - Retail | CVS Pharmacy | | | | | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy | Optum Rx Mail Service Pharmacy | CenterWell Pharmacy | Birdi, Inc. | Express Scripts Pharmacy (via contract) |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo | Optum Specialty Pharmacy | CenterWell Specialty Pharmacy | Specialty by Birdi | Accredo (via contract) |
| Health Insurer | Aetna | Cigna Healthcare | UnitedHealthcare | Humana | | 19 BlueCross BlueShield plans |

1

## C. Prime and ESI

36. Prime and ESI are PBMs that compete against each other. In fact, ESI's parent company, the Cigna Group, lists Prime as its competitor in securities filings.

37. There are two relevant and related ways in which PBMs like Prime and ESI compete against each other. First, they compete against each other to be the exclusive PBM for specific healthcare plan sponsors. Second, they compete against each other to entice pharmacies to join their pharmacy network—which in turn helps them compete for exclusivity with plan sponsors.

[1] Fed. Trade Comm'n, *Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies* 6 fig. 1 (2024).



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

38. To be attractive to healthcare plan sponsors, Prime and ESI compete in multiple ways. One main way is fostering a large pharmacy network that dispenses the prescription drugs to the healthcare plan's members. The more members they cover, the more important it is to a pharmacy to be in their network. The more important their network is to a pharmacy, the more they can negotiate friendly contract terms, including the reimbursement rates and dispensing fees paid to pharmacies.

39. The basic principles of economies of scale lead larger PBMs like ESI to be able to achieve more favorable contract terms. Given ESI's "Big 3" size—covering one in three Americans—ESI can leverage its market power when negotiating with retail pharmacies. It mainly does so by forcing pharmacies into accepting lower reimbursement rates and/or dispensing fees in exchange for being a network pharmacy for one in three covered Americans. Pharmacies are stuck between a rock and a hard place. They can either accept the terms that ESI offers or lose access to the opportunity to fill one third of covered Americans' prescriptions. This choice is illusory given ESI's size. It has leveraged its 100 million covered lives to obtain lower reimbursement rates for itself than smaller PBMs like Prime.

40. Prime, as the sixth largest PBM, does not have the same type of market power as ESI and other PBMs that would make Prime as necessary for pharmacies. Thus, to compete with ESI and other PBMs, Prime must offer more favorable terms to pharmacies to entice pharmacies to join Prime's network. One of those terms is reimbursement rates.

41. To compete with ESI for pharmacies join Prime's network, Prime had to offer pharmacies higher reimbursement rates than ESI did. In other words, lawful, merits-based competition required Prime to pay pharmacies more than ESI. For example, Prime's reimbursement rates historically hovered around 20 percent higher than the largest PBMs, like ESI.

42. But then Prime and ESI fixed the game.

## II. The Price-Fixing Agreement

### A. Prime and ESI agree to fix prices

43. Unable to compete on the merits, Prime decided to do something about the higher reimbursement rates forced on it by lawful competition: execute an anticompetitive and illegal horizontal contract with ESI.

44. On December 19, 2019, Defendants "announced a new three-year collaboration," where "[ESI] will provide services to Prime related to retail pharmacy network and pharmaceutical manufacturer contracts" (the "Agreement"). While seemingly innocuous, this was a deceptive announcement of a horizontal price-fixing agreement between two competing PBMs.

45. Under the Agreement, Prime fixed its reimbursement rates to match ESI's and began reimbursing Prime's network pharmacies at ESI's lower reimbursement rates—making Prime's business far more profitable overnight. In return, Prime shared with ESI a portion of the "savings" benefits Prime received plus the ability to add Prime's covered lives to its own—thereby increasing even further ESI's leverage over pharmacies to still lower reimbursements.

46. This Agreement effectively eliminated competition between Prime and ESI for the procurement of pharmaceutical drug dispensing services from retail pharmacies and the reimbursement rate that Defendants offered to those retail pharmacies. Instead of competing with each other for healthcare plan sponsors, Prime and ESI agreed to distort that competition on the merits in their favor—to the detriment of the Florida's retail pharmacies.

47. Prime could have found other legal ways to grow or innovate to achieve more favorable reimbursement rates. Instead, it colluded with a larger competitor to reach the same result. In the process, Prime deprived Floridians of the innovations in service that would have been needed to competitively obtain that market share.

48. The Agreement, which Defendants reduced to writing, was originally for a term of three years with built in options for extensions. It constitutes a price-fixing violation of the antitrust laws. And it has been continuously harming retail pharmacies and the competitive process in Florida for the last six years.

### B. Prime deceptively and misleadingly describes the Agreement

49. Prime followed up the Agreement announcement by sending a letter to pharmacies. The letter provided pharmacies with notice of Prime's intent to use ESI's pharmacy networks. The letter stated "[a]s part of this new collaboration, Prime's health plans will begin to transition to ESI's commercial and Medicaid pharmacy networks." The letter added that "[a]s part of the transition, there will be no changes to claims processing requirements, including BIN/PCNs," and that, "Prime will continue to operate our claims processing platform." Prime closed the letter by stating



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

that pharmacies with "questions regarding their terms and conditions, including reimbursement with ESI," should contact ESI.

50. This short, vague notice did not provide pharmacies with a full account of the relevant details or ramifications of the Agreement. No reasonable network pharmacy would have known that the reimbursement rates and dispensing fees that the pharmacy previously negotiated with Prime (rather than ESI) would change based on reviewing this letter. The details that were omitted were substantive and failed to explain the true nature of the Agreement.

51. For example, take Prime's statement in the letter that if a pharmacy had questions about their terms and conditions, "including reimbursement with ESI," they should email an ESI email address. That single sentence provides insufficient notice to pharmacies of the imminent reimbursement rate consequences of the Agreement on retail pharmacies—especially after Prime assured pharmacies just a few sentences earlier that Prime would "continue to operate" its own claims processing platform.

### C. Defendants concede they did not execute a Merger or form a Joint Venture

52. Defendants represented in the Agreement announcement that they would "continue to work independently with pharmaceutical manufacturers ... [with] each company separately managing certain relationships on the medical benefit and value-based contracting." And in its letter to pharmacies after the Agreement announcement, Prime again reassured pharmacies of their independence from ESI. There, it stated "Prime will continue to operate our claims processing platform, as

well as manage and deliver a wide range of services to our clients and their members, including pharmacy network management, formulary management and clinical programs."

53. These statements show that the Agreement is not an attempt by Prime and ESI to merge or design a joint venture. There is no combination of assets between Prime and ESI, and the Agreement did not result in new innovative products or services.

54. As former Prime CEO Ken Paulus explained, "[t]he beauty of the relationship" between Prime and ESI that was formed by the Agreement "is we didn't really hand over the keys ... we didn't really change anything at Prime other than [reimbursement rates]." Prime still processes its own claims and otherwise operates independently. The only change resulting from the Agreement is that Prime agreed to fix prices with a competitor—ESI—adopting ESI's prices as its own.

55. The Agreement does not offer any efficiencies or procompetitive economic effects. Instead, the Agreement simply details a price-fixing scheme entered into by two competing PBMs.

**D. Defendants implement the Agreement and extend it many times.**

56. Once the Defendants entered into the collusive Agreement, Defendants made certain that the Agreement would succeed. For example, according to the findings from a recent arbitration in which Prime participated as a party (the "Prime Arbitration"), "Prime aligned its payment rates to pharmacies ... to ESI's payment rates under ESI's networks. Prime used ESI's more favorable—i.e., lower—retail



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

network rates as payment standards for Prime's own national retail networks. Prime adjudicated and paid claims from ... pharmacies consistent with the then-current ESI pricing rules."

57. The Prime Arbitration decision found that to "ensure that alignment of rates, Prime and ESI implemented numerous pricing restrictions—'guardrails', 'minimums', 'maximums', and 'targets'—upon Prime that it had to hit or fall within in the aggregate over each year of the Collaboration. Prime was prohibited from going outside the guardrails or below ESI's floor pricing for every pharmacy provider in each of Prime's pharmacy networks."

58. Prime and ESI also met regularly to ensure Prime was staying within the bounds of the Agreement. ESI also "sent monthly, quarterly, and year-end reports to Prime that showed whether and how Prime met the ESI targets." And ESI even "made a true-up payment to Prime based on year-end results if Prime did not precisely hit the aggregate set reimbursement rates."

59. Prime and ESI have continued this conduct for years. They have continued to implement the terms of the Agreement in Florida on a daily basis up to and including the time of this Complaint. They also have renewed the Agreement multiple times since it originally went into effect—including within the last four years—and the Agreement remains in effect today. Defendants have been illegally reimbursing Florida pharmacies at price-fixed rates essentially daily since the Agreement originally went into effect on April 1, 2020, through the date of this Complaint.

60. Each time that Defendants have reimbursed a Florida pharmacy at an artificially lower, price-fixed rate because of the Agreement, their act constitutes a new, overt violation of the law and demonstrates the continuing and accumulating harm the Agreement has had, and continues to have, on Florida pharmacies—up to and through the date of this Complaint.

## III. Relevant Markets

61. Under the antitrust laws, some restraints are so egregious that they are considered *per se* illegal. One such example is when, as here, horizontal competitors like Prime and ESI engage in price fixing. The Agreement is thus an illegal *per se* restraint of trade between two competitors to anticompetitively fix reimbursement rates. Or as the Prime Arbitration decision put it, the Agreement is "a price-fixing agreement that affected Prime's pricing of its reimbursements to" pharmacies.

62. When an antitrust violation is *per se* illegal, it is unnecessary to define the relevant market(s) or allege market power.

63. If Defendants' conduct is not held to be a *per* se violation of Florida law, the Agreement still violates Florida antitrust laws under an alternative rule of reason analysis. Or to again quote the Prime Arbitration decision, the Agreement is "also an unreasonable restraint because," among other things, "it undermined—even abandoned—the previously negotiated contract reimbursement rates between [pharmacies] and Prime."

### A. The Relevant Product Market

64. The relevant product market is the procurement of pharmacy dispensing services from retail pharmacies by PBMs ("Pharmacy Dispensing Services Market"). PBMs contract with retail pharmacies to secure the ability of members of an insurance plan to receive the benefit of their pharmacy coverage for prescription drugs from a retail pharmacy.

65. In the Pharmacy Dispensing Services Market, PBMs are purchasers, contracting with retail pharmacies to dispense drugs at a designated reimbursement rate. Retail pharmacies are the sellers, dispensing drugs at the price set by the reimbursement rate. Without contracting with PBMs to sell Pharmacy Dispensing Services, retail pharmacies would not have enough patients to keep their doors open.

66. PBMs process claims for the approximately 92% of Americans who have health insurance. The remainder of Americans without health insurance do not use a PBM, but rather purchase prescription drugs with cash. For retail pharmacies, cash-paying patients alone are not a reasonable substitute for the volume of commerce that flows through PBMs.

### B. The Relevant Geographic Market

67. The relevant geographic market is the United States. When PBMs contract with pharmacy chains, PBMs contract for pharmacy dispensing services nationwide. Further, the agreement between Prime and ESI is not geographically limited to a particular state, but rather covers the entire United States.



2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM

68. An alternative geographic market is the State of Florida. The State of Florida, through the Office of Insurance Regulation ("OIR"), regulates PBMs. PBMs must register with OIR, have regular reporting to OIR, and can be fined by OIR for operating in the state without a valid certificate of authority. Further, PBMs contract with health insurance plans, which operate wholly in individual states, including Florida.

69. The Relevant Product Market and Relevant Geographic Market together create the Relevant Market.

### C. Defendants' Market Power in the Relevant Market

70. Again, in the case of a *per se* illegal price fixing agreement like the Agreement here, it is not necessary to allege market power. But to the extent that proof of market power is needed, it is demonstrated by market shares and the number of covered lives between the two companies.

71. ESI represents over 100 million covered lives and Prime represents over 30-35 million covered lives nationwide. So there is little that a retail pharmacy could do to push back. Florida's retail pharmacies will struggle to stay in business if they choose not to conduct business with Defendants.

## IV. The Agreement has Continuously Harmed Florida Pharmacies and Competition in the Relevant Market

72. The Agreement has harmed competition by distorting the benefits that come from a competitive marketplace.

73. Former Prime CEO Ken Paulus commented that the Agreement has "been hugely successful," resulting in "literally the billions of dollars of savings for

our clients that we wouldn't have otherwise seen." But Prime's "savings" of billions of dollars via an illegal price-fixing arrangement means pharmacies across the country—including in Florida—are suffering.

74. Mr. Paulus explained that Prime entered into the Agreement because Prime was "the highest paying retail pharmacy network pharmacy payer in the marketplace ... paying 20% more than" its competitors. The Agreement fixed that, reducing the reimbursement rates Prime paid pharmacies by around 15 to 20 percent.

75. Most pharmacy revenue comes from dispensing pharmaceutical drugs. So a sudden price change of 15 to 20 percent is devastating. It can make otherwise profitable drugs turn into losses, requiring pharmacies to fill prescriptions for less than it costs to acquire them. When pharmacies experience this squeeze, they may be forced to make the difficult decision to exit the market, leaving Floridians with fewer choices.

76. An analysis of data for hundreds of pharmacies exemplifies the harm this Agreement has inflicted on pharmacies.

77. Once the Agreement became effective, for around 80% of branded drugs, pharmacies saw their rates from Prime decline. Similarly, around 80% of branded drugs covered by Prime also saw their profitability go down. These declines are massive, real-world harms experienced by pharmacies throughout the State.

78. Even worse, hundreds of branded drugs that were profitable before this Agreement became unprofitable after the Agreement—requiring the pharmacies to dispense these drugs below their costs to acquire them.

79. For example, a pharmacy located outside Orlando was reimbursed $60.85 per prescription for the drug Dilt-XR before the Agreement. But after the Agreement became effective, the reimbursement from Prime went down 45% to $34.16. Rather than producing a profit, every time the pharmacy chose to serve its Prime patients and dispense this drug, it would now lose $15.45.

80. Another pharmacy, located in St. Cloud, Florida, profitably filled the drug Pregabalin 100mg capsule for $18.02 before the Agreement. After the Agreement, its reimbursement from Prime fell by 80% and that same pharmacy lost $10.31 for each prescription.

81. Similarly, a pharmacy in Jacksonville saw its profits from the drug Ellipta fall from $10.20 per prescription to a loss of $15.95.

82. These examples are not aberrations. They are representative of other pharmacies' experiences throughout the State when filling branded prescriptions.

83. The story is no different for generic drugs. Once the Agreement became effective, for around 70% of generic drugs, pharmacies saw their rates from Prime decline. Around 65% of generic drugs covered by Prime also saw their profitability decline. Much like some of the branded drugs, many generic drugs that were once dispensed at a profit saw their reimbursements fall so much that they became unprofitable.

84. For example, a Leesburg pharmacy dispensed the extremely common drug levothyroxine 125 mg, which is used to treat hypothyroidism. Once the Agreement became effective, this pharmacy saw its reimbursements from Prime for

that drug go down by 22% and a 70% decline in its profitability. The pharmacy also had a similar experience for levetiracetam 500 mg—a drug to treat epilepsy and seizures. It saw almost a 30% reduction in reimbursements from Prime for that drug and an 80% decline in profits. The experiences of this pharmacy are representative of pharmacies throughout the State.

85. The extent of the harms to these pharmacies is laid bare by the "cost savings" touted by Prime and ESI. Prime has valued the Agreement at $2.5 billion over the first three years. It has acknowledged "its $2.5 billion of cost savings that arose from the Collaboration—cost reductions that reflected the nationwide reduction of reimbursements to pharmacies."

86. That $2.5 billion in "cost reductions," though, is $2.5 billion dollars unjustly taken, in part, from Florida pharmacies to the potential detriment of the Floridians they serve. For example, a pharmacy that went through arbitration with Prime over this agreement has already been awarded over $10 million in damages.

87. Prime feels no remorse for the harm from its anticompetitive Agreement. As former Prime CEO, Ken Paulus, put it: "It's been worth every penny."

## COUNT I

## VIOLATION OF FLORIDA ANTITRUST ACT SEC. 542.18 CONSPIRACY IN RESTRAINT OF TRADE

88. The Attorney General repeats and incorporates by reference the allegations in paragraphs 1 through 87 as if fully set forth here.

89. Defendants knowingly, voluntarily, and intentionally entered into a continuing agreement, understanding, and conspiracy in violation of § 542.18, Florida Statutes. This conduct is still occurring and is inflicting continuing harm on Florida pharmacies.

90. Defendants entered into an agreement to fix reimbursement rates given to pharmacies across the United States, including Florida pharmacies, communicated to ensure adherence to the terms of the agreement, and implemented the agreement through financial true-up payments to ensure pricing parity.

91. Defendants' anticompetitive conduct has a substantial impact on Florida commerce. Because Defendants control a substantial portion of the market for PBM services, Florida pharmacies are unable to forgo conducting business with Defendants by switching to an alternative and are continuing to suffer a pecuniary injury as a result.

92. Defendants' anticompetitive conduct is not outweighed by any pro-competitive benefits. Indeed, as a horizontal agreement not to compete on the price of reimbursement rates they give, there is no benefit to Florida pharmacies.

93. This is an enforcement action that alleges civil violations of the Florida Antitrust Act, section 542.18, Florida Statutes. The Attorney General seeks equitable

relief, declaratory relief, civil penalties, injunctive relief, attorney's fees and costs, and other relief under sections 542.21 and 542.23, Florida Statutes, for each contract, combination or conspiracy that restrained any part of trade or commerce within Florida in violation of section 542.18, Florida Statutes.

94. The conduct described above constitutes one or more violations of section 542.18, Florida Statutes.

## COUNT II

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT FOR CONDUCT BEFORE JANUARY 1, 2024

95. The Attorney General repeats and incorporates by reference the allegations in paragraphs 1 through 87 as if fully set forth here.

96. Chapter 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) declares that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Unfair methods of competition are prohibited by FDUTPA.

97. The provisions of FDUTPA are to be "construed liberally" to promote the protection of the "consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

98. Section 501.203(3), Florida Statutes, establishes that a violation of the Florida Deceptive and Unfair Trade Practices Act may be based on any of the following: (a) any rules promulgated pursuant to the FTC Act; (b) the standards of

unfairness and deception set forth and interpreted by the FTC or the federal courts; or (c) any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

99. In many instances, while engaged in trade or commerce, Defendant has violated, and will continue to violate, section 501.204 of FDUTPA by, among other things, engaging in unfair methods of competition.

100. Defendants' conduct constitutes an unfair method of competition in violation of the Florida Deceptive and Unfair Trade Practices Act, as amended, in section 501.204, Florida Statutes.

## COUNT III

## UNJUST ENRICHMENT

101. The Attorney General repeats and incorporates by reference the allegations in paragraphs 1 through 87 as if fully set forth here.

102. Defendants have been unjustly enriched as a result of the unlawful and inequitable conduct described above. Florida pharmacies provided pharmacy dispensing services to Defendants, who through their agreement to fix prices, unjustly retained an uncompetitive portion of the pharmacy reimbursement rate.

103. Defendants knew of and retained the benefits of Florida pharmacies' services at amounts in excess of the competitive price.

104. Based on Defendants' conduct described above, it would be inequitable and unjust for Defendants to retain such benefits without payment of value. Defendants will be unjustly enriched if they are permitted to retain the benefits

received resulting from the anticompetitive fixing of reimbursement rates paid to Florida pharmacies.

105. Defendants are aware of the benefits received from Florida pharmacies and consciously accepted the benefits and continue to do so to this day.

106. There is no adequate remedy at law.

107. If required, this claim is pleaded in the alternative to the other claims in this Complaint.

## Jury Demand

The Attorney General demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, the Attorney General respectfully asks that this Court:

1. Enter judgment for the Attorney General and against Defendants;

2. Declare that Defendants' actions violate FDUTPA, the Florida Antitrust Act, and common law;

3. Enjoin Defendants to prevent future violations of FDUTPA, the Florida Antitrust Act, and common law;

4. Award civil penalties and attorneys' fees under FDUTPA, the Florida Antitrust Act, and common law;

5. Award actual damages under FDUTPA, the Florida Antitrust Act, and common law;

6. Award any ill-gotten gain, disgorgement and/or restitution;

7. Award to the State of Florida treble damages for violations of section 542.18, Florida Statutes;

8. Award pre- and post- judgment interest as provided by law;

9. Order that Defendants pay court costs and all costs associated with distributing and executing on any restitution or judgement made by this Court; and

10. Grant any other such legal or equitable relief as justice permits.

Dated: August 27, 2026

Respectfully submitted,

JAMES UTHMEIER
Attorney General

RYAN D. NEWMAN
Chief Deputy Attorney General

JASON HILBORN
Deputy Attorney General
Civil Division

*/s/ Timothy Fraser*
Lizabeth A. Brady (FBN 457991)
*Director, Antitrust Division*
Timothy Fraser (FBN 957321)
*Special Counsel*
Mary A. Wessling (FBN 93590)
*Senior Assistant Attorney General*
Tyler A. Kovacs (FBN 1044676)
*Assistant Attorney General*

FLORIDA OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-9134
Liz.Brady@myfloridalegal.com
Timothy.Fraser@myfloridalegal.com
Mary.Wessling@myfloridalegal.com
Tyler.Kovacs@myfloridalegal.com
*Counsel for the Attorney General*



**2026CA-004256-A000-BA Received in Polk 08/27/2026 09:16 AM**